# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-06-00122-CV

**AEP Texas North Company, f/k/a West Texas Utilities Company, Appellant**

**v.**

**SPA Pipe, Inc. d/b/a Smith Pipe of Abilene and SPA Pipe & Supply, LP, Appellees**

### FROM THE DISTRICT COURT OF TOM GREEN COUNTY, 51ST JUDICIAL DISTRICT NO. A-01-1149-C, HONORABLE BEN WOODWARD, JUDGE PRESIDING

## M E M O R A N D U M   O P I N I O N

Felipe Hernandez was injured after coming into contact with one of AEP Texas North Company's ("AEP") power lines, which had snagged on his employer's truck. At the time, Hernandez was working for SPA Pipe.[1] Hernandez sued AEP, and AEP eventually settled with Hernandez. As a result of the suit, AEP sought indemnity from SPA Pipe for the settlement and other costs incurred as a result of the incident. In response, SPA Pipe filed a motion for summary judgment contending that AEP was not entitled to indemnification as a matter of law. The district court granted the motion, and AEP appeals that determination. We will reverse the judgment of the district court and remand the case back to the district court.

---

[1] The parties in this case disputed whether Hernandez was working for SPA Pipe, Inc. or SPA Pipe & Supply, LP. Due to its ultimate resolution of the case, the district court did not have to determine which entity was Hernandez's employer. For the purposes of discussion, we will refer to both parties jointly as "SPA Pipe."

## BACKGROUND

Hernandez was an employee of SPA Pipe, and John Gutierrez was his supervisor. On September 3, 1999, Hernandez and Gutierrez drove to a ranch to pick up two oil tanks that SPA Pipe had purchased. In preparation for the trip, SPA Pipe had obtained a permit from the Texas Department of Transportation allowing SPA Pipe to carry an oversized load up to 17 feet high. *See* Tex. Transp. Code Ann. § 621.207(a) (West 1999) (specifying that "[a] vehicle and its load may not be higher than 14 feet"); 43 Tex. Admin. Code §§ 28.10-.13 (2008) (allowing individual to obtain permit for oversized loads).

Shortly after Gutierrez and Hernandez loaded the tanks onto SPA Pipe's truck, they left the ranch and headed for the drop-off site with Gutierrez driving the truck. Some of AEP's overhead high-voltage electrical wires crossed the highway that Gutierrez and Hernandez were traveling on. *See* Tex. Health & Safety Code § 752.001 (West 2003) (defining "high voltage" as meaning more than 600 volts and "overhead line" as meaning "a bare or insulated electrical conductor installed above the ground"). As they approached one set of power lines, Gutierrez and Hernandez noticed that some of the lines were hanging low enough that they might catch on the tanks. To prevent that from happening, Gutierrez drove slowly underneath the lines, but one of the lines got caught on one of the tanks anyway. Gutierrez attempted to dislodge the line by slowly driving the truck back and forth. Because the line did not release, Gutierrez instructed Hernandez to climb on top of the truck and physically remove the line from the tank. Although Hernandez tried to lift the line off the tank, he was unable to untangle the line. After determining that Hernandez

2

would be unable to physically remove the line, Gutierrez began backing the truck up. This caused Hernandez to lose his balance and come into contact with one of the other power lines. As a result of the contact, Hernandez sustained significant injuries. No attempt was made to contact AEP until after Hernandez was injured.

It is undisputed that the lines in question were hanging below the minimum height required by the utilities code. *See* Tex. Util. Code Ann. § 181.045(b)(2) (West 2007) (requiring utility to "construct a transmission line that crosses a highway or road so that the line is at least 22 feet above the surface of the traffic lane"). Relying on that fact, Hernandez sued AEP. He ultimately settled with AEP.[2] In response to Hernandez's suit, AEP filed an indemnity claim against SPA Pipe pursuant to section 752.008 of the health and safety code. *See* Tex. Health & Safety Code Ann. § 752.008 (West 2003). Essentially, AEP argued that because SPA Pipe did not inform AEP of its intent to work on the lines before beginning the work and because SPA Pipe began the work without coming to an agreement with AEP regarding safety measures that could be taken, SPA Pipe was required to indemnify AEP for the settlement AEP made and other damages AEP sustained.

After AEP requested indemnification, SPA Pipe filed a motion for summary judgment contending that AEP was not entitled to indemnity from AEP. Specifically, SPA Pipe asserted that chapter 752 of the health and safety code does not apply to the circumstances of this case. Alternatively, it contended that even if chapter 752 applied, the indemnity provision does not apply when a utility has failed to maintain its power lines above the statutory minimum height. The district

---

[2] As part of the settlement, Hernandez was awarded $3,575,000.

3

court granted the motion but did not specify the ground upon which the motion was granted. AEP appeals the district court's judgment.[3]

## STANDARD OF REVIEW

On appeal, AEP contends that the district court improperly granted SPA Pipe's motion for summary judgment. We review the decision to grant a summary judgment de novo. *Valence Operating Co. v. Dorsett*, 164 S.W.3d 656, 661 (Tex. 2005). When, as here, the district court's judgment does not indicate the grounds upon which the motion was granted, we must affirm the district court's judgment if any of the grounds presented are meritorious. *Western Invs., Inc. v. Urena*, 162 S.W.3d 547, 550 (Tex. 2005).

Both parties agree that the relevant facts are not in dispute, and the issues raised in this appeal involve statutory construction, which is a question of law that is reviewed de novo. *See Bragg v. Edwards Aquifer Auth.*, 71 S.W.3d 729, 734 (Tex. 2002); *USA Waste Servs. of Houston, Inc. v. Strayhorn*, 150 S.W.3d 491, 494 (Tex. App.—Austin 2004, pet. denied). When construing statutes, we must ascertain the legislature's intent in enacting the statutes. *Fleming Foods of Tex. v. Rylander*, 6 S.W.3d 278, 284 (Tex. 1999). In making this determination, courts should look to the plain meaning of the words used in the statute. *See Fireman's Fund County Mut. Ins. Co. v. Hidi*, 13 S.W.3d 767, 768-69 (Tex. 2000). We presume that every word was deliberately chosen

---

[3] We note that shortly after AEP entered into a settlement agreement with Hernandez and over a year before SPA Pipe filed its motion for summary judgment, AEP also filed a motion for summary judgment contending that it was entitled to indemnity as a matter of law. Nothing in the record before this Court indicates that the district court ruled on AEP's motion. Moreover, the district court's order granting SPA Pipe's motion for summary judgment does not mention AEP's motion, and AEP's prayer for relief simply asks this Court to reverse the district court's judgment and remand "for further proceedings" without mentioning its motion for summary judgment.

4

and that excluded words were left out on purpose. *USA Waste Servs.*, 150 S.W.3d at 494. When determining legislative intent, the entire act, not isolated portions, must be considered. *Jones v. Fowler*, 969 S.W.2d 429, 432 (Tex. 1998). We may also consider the "object sought to be attained" by enacting the statute and the "consequences of a particular construction." Tex. Gov't Code Ann. § 311.023 (West 2005). Furthermore, if two statutes address the same subject, they should be read together and harmonized with each other even if the statutes do not refer to one another. *In re VanDeWater*, 966 S.W.2d 730, 732 (Tex. App.—San Antonio 1998, orig. proceeding).

### STATUTORY FRAMEWORK

Before addressing the merits of this case, we provide a brief summary of the provisions of the health and safety code that relate to performing work near overhead power lines. The health and safety code mandates that a "person, firm, corporation, or association" (cumulatively "person"), other than a utility employee, engaged in "temporary work or a temporary activity or function" (cumulatively "temporary work") that is close to an "overhead line" must "notify the [utility] at least 48 hours" prior to engaging in the work near the line. Tex. Health & Safety Code Ann. §§ 752.002-.03(a) (West 2003). Moreover, the code forbids a person from beginning the temporary work unless the person and the utility enter into "a satisfactory mutual arrangement" regarding safety measures that are to be taken to prevent potential injuries. *Id.* § 752.003(b) (West 2003). For example, the agreement may provide for "temporary de-energization and grounding, temporary relocation or raising of the line, or temporary mechanical barriers to separate and prevent contact between the line and . . . the person performing the" temporary work. *Id.*

5

Further, the code requires the person "responsible for the" temporary work to pay the utility for the costs associated with "providing clearance" and allows the utility to require payment in advance. *Id.* § 752.003(c) (West 2003).

The prohibition against performing temporary work applies to work that is going to be performed within six feet of a power line. *Id.* § 752.004 (West 2003). In particular, the code provides that unless a person "effectively guards against danger by contact with the line," the person "may not perform" temporary work "if at any time it is possible that the person . . . may" be placed within or bring "any part of a tool, equipment, machine, or material" within six feet of an overhead line. *Id.* § 752.004(a). Further, the code prohibits a person from transporting structures, tools, machines, equipment, supplies, or materials "within six feet of a high voltage overhead line." *Id.* § 752.005 (West 2003). Finally, the code specifies that an employer "may not require an employee to perform a function or activity" that would violate the six-foot mandate. *Id.* § 752.004(b).

The overall intent behind the passage of chapter 752 was to ensure the safety of individuals engaged in activities near power lines. *Ringo v. Gulf States Util. Co.*, 569 S.W.2d 31, 35 (Tex. Civ. App.—Beaumont 1978, writ ref'd n.r.e.). In light of that intent, the code imposes criminal penalties for violations of chapter 752, *see* Tex. Health & Safety Code Ann. § 752.007 (West 2003), and also requires a person that violates chapter 752 to indemnify a utility for any damage or liability that it sustains as a result of the violation, *id.* § 752.008 (West 2003). Concerning indemnification, section 752.008 provides as follows:

> If a violation of this chapter results in physical or electrical contact with a high voltage overhead line, the person, firm, corporation, or association that committed the violation is liable to the owner or operator of the line for all damages to the

facilities and for all liability that the owner or operator incurs as a result of the contact.

*Id.* Essentially, the indemnification provision places "liability for losses resulting from noncompliance with the notification and safety provisions" on the person responsible "for having workers near a power line." *Chavez v. City of San Antonio*, 21 S.W.3d 435, 439 (Tex. App.—San Antonio 2000, pet. denied).

## DISCUSSION

As discussed previously, in its summary judgment motion, SPA Pipe asserted two grounds as to why the district court should rule in its favor. First, SPA Pipe contended that chapter 752 of the health and safety code does not apply to this case because those provisions concern "temporary work" performed near power lines, which cannot include the activity at issue in this case. Alternatively, SPA Pipe contended that AEP was not entitled to indemnity under the health and safety code because it failed to maintain the height of its overhead lines above the 22-foot height requirement specified in the utilities code. *See* Tex. Util. Code Ann. § 181.045(b)(2). In other words, SPA Pipe argued that the indemnity provision does not apply to negligent utilities. AEP, on the other hand, disputes the propriety of granting summary judgment on either ground. We will address these alternative grounds in the order listed.

*The Health and Safety Code Provisions Apply to the Temporary Work Done in this Case*

On appeal, AEP contends that to the extent that the district court's judgment was based on the ground that chapter 752 did not apply, the district court erred because chapter 752 of the health and safety code applies to the facts of this case. SPA Pipe disagrees. First, SPA Pipe

7

contends that chapter 752, including the six-foot prohibition, *see* Tex. Health & Safety Code Ann. §§ 752.003-.005, only applies when a person plans in advance to engage in temporary work and when the person is aware that the temporary work will occur near an overhead power line. In other words, SPA Pipe asserts that in order to invoke chapter 752, a person must be aware of the existence of an overhead line and must engage in a type of temporary work near the line that is amenable to giving the utility 48 hours notice before commencing the work so that the utility can make the necessary safety measures and so that the person can make payment arrangements with the utility regarding the safety measures to be taken.[4] For example, SPA Pipe asserts that chapter 752 properly applies to activities like painting a building, *see Trail v. Friedrich*, 77 S.W.3d 508 (Tex. App.—Houston [1st Dist.] 2002, pet. denied), trimming trees, *see Chavez*, 21 S.W.3d 435, or working on a billboard, *see Whiteco Metrocom, Inc. v. Texas Utils. Elec. Co.*, 30 S.W.3d 421 (Tex. App.—Dallas 2000, pet. denied).

In light of the preceding, SPA Pipe argues that chapter 752 does not apply to the circumstances of this case. Although SPA Pipe concedes that it is possible that chapter 752 might apply to work performed on or near a highway, it argues that it does not apply here because SPA Pipe did not plan to perform temporary work near the power lines in question. To the contrary, SPA Pipe contends that it only accidentally snagged the line as a result of the fact that the line was below the 22 foot minimum and that it had no prior knowledge that it would be in close proximity

---

[4] In its brief, SPA Pipe asserts that "section 752.003 plainly contemplates the existence of three circumstances and a sequence of events in order for its provisions to be given effect: (1) that temporary work is planned far enough in advance to give a utility 48 hours notice; (2) that the person responsible for the work is aware of the particular lines and the problems they pose in advance so they can contact the operator and reach an arrangement to prevent contact with the lines; and (3) that the person responsible for the work will pay for the utilities expenses."

8

to an overhead line. Accordingly, SPA Pipe insists that it was not engaged in a type of work that would have allowed for prior notice to be given to AEP or for an opportunity to ask AEP to make appropriate safety arrangements, such as de-energizing or raising the overhead lines.

Second, SPA Pipe argues that chapter 752 of the health and safety code does not apply to the circumstances present in this case because it does not govern "ordinary travel" on highways or the transportation of oversized loads on highways; instead, SPA Pipe asserts that this case is controlled by provisions of the transportation code and the administrative code and by the provision of the utilities code requiring utilities to maintain their power lines at least 22 feet above the ground. *See* Tex. Transp. Code Ann. §§ 621.001-.508 (governing vehicle size and weight and establishing maximum load height of 14 feet), 622.001-.953 (containing special provisions for oversize and overweight vehicles), 623.001-.219 (relating to permits for oversize or overweight vehicles) (West 1999 & Supp. 2008)[5]; Tex. Util. Code Ann. § 181.045; 43 Tex. Admin. Code §§ 28.1-.102 (2008) (governing oversize and overweight vehicles and loads and containing provisions allowing for issuance of permits for oversize loads).[6] Moreover, SPA Pipe notes that none of those provisions authorize a utility to be indemnified for damages or liability it sustains as a result of a person's election to travel on a highway or to transport an oversized load on a highway. Furthermore, although SPA Pipe acknowledges that the administrative code does require carriers of

_____

[5] We note that none of the provisions of the transportation code governing vehicle size and oversized loads addresses work performed near overhead power lines. *See* Tex. Transp. Code Ann. §§ 621.001-623.219 (West 1999 & Supp. 2008).

[6] Further, we note that in its brief, SPA Pipe conceded that the load it was carrying exceeded the height limitation authorized by its permit and also acknowledged that, as a result, it might not have been in compliance with all of the requirements of the administrative code because it had not used an escort vehicle. *See* 43 Tex. Admin. Code § 28.11(k)(4)(A) (2008) (requiring front escort vehicle for loads that exceed 17 feet). After the tanks were loaded onto a trailer, the height of the load was 17 feet 10 inches.

oversized loads to "contact utility companies . . . when it is necessary to raise or lower any overhead wire . . . or other overhead obstruction," 43 Tex. Admin. Code § 28.11(k)(1)(C) (2008),[7] SPA Pipe notes that the code does not contain a specific requirement that an individual notify a utility beforehand of its plans to carry a load that will come within six feet of an overhead line. For this reason, SPA Pipe insists that this obligation is distinct from the obligation to notify a utility regarding temporary work that may be performed near an overhead line.

Finally, SPA Pipe argues that applying chapter 752 to the circumstances in this case will lead to the absurd result that individuals who plan on traveling on a highway but do not plan on engaging in temporary work near a power line will nevertheless be required, prior to traveling, to inform utilities of their travel plans 48 hours in advance if the top of the individuals' vehicles or loads that they will be carrying will come within six feet of overhead lines and that the failure to notify will constitute a chapter 752 violation and will subject the individuals to criminal sanctions even if they were able to safely navigate under the lines. *See Lowe v. Rivera*, 60 S.W.3d 366, 369 (Tex. App.—Dallas 2001, no pet.) (stating that statutes should not be construed in manner that leads to absurd results).[8]

---

[7] This notification requirement was also specifically included in SPA Pipe's oversized-load permit.

[8] SPA Pipe also argues that concluding that chapter 752 applies to the circumstances present in this case will lead to the absurd result that individuals traveling on highways who observe that their route will place their vehicles within six feet of overhead power lines will have to pay utilities that use those lines to raise the lines even if the lines have fallen below the 22 foot requirement found in the utilities code. *See* Tex. Util. Code Ann. § 181.045(b)(2) (West 2007) (minimum height); Tex. Health & Safety Code Ann. § 752.003(c) (West 2003) (requiring person responsible for work to pay utility "the actual expense incurred by the operator in providing the clearance"). Although when construing statutes, we are required to read statutes as a whole, we are also limited by the facts as they are presented in an appeal. In this appeal, we are not confronted with making a determination regarding what party will have to pay for the safety arrangements taken when a power line has fallen

10

At the outset, we note that in this case we are not confronted with the issue of determining whether chapter 752 applies to individuals engaged in ordinary travel on highways or even to individuals with oversized loads engaged in ordinary travel on highways. Rather, we must determine whether the activities engaged in by SPA Pipe's employees, which amounted to more than ordinary travel on a highway, constituted temporary work and, therefore, invoked the provisions of chapter 752. For this reason, in resolving this case, we need not determine, as encouraged by SPA Pipe, whether chapter 752 applies to all individuals engaged in "ordinary travel" who drive vehicles with heights that come within six feet of overhead lines or transport oversized loads with heights that come within six feet of overhead lines.

Although the exact point at which chapter 752 became applicable in this case can be disputed, there can be no doubt that SPA Pipe's employees engaged in temporary work near an overhead power line when Gutierrez ordered Hernandez to climb on top of the truck and attempt to remove the entangled power line. Whatever else the phrase "person . . . responsible for temporary work . . . closer [than six feet] to a high voltage overhead line" may mean, it must include attempts to remove a power line that has become entangled on a motor vehicle or on a load that the vehicle was transporting. *See* Tex. Health & Safety Code Ann. § 752.003; *cf. Travelers Ins. Co. v. L.V. French Truck Service, Inc.*, 770 P.2d 551, 553-54 (Ok. 1988) (assuming that employer violated six-foot prohibition when its employees climbed on top of truck in order to attempt to remove overhead power line that had become snagged on truck). This conclusion is supported by the language in

---

below the statutory minimum height. For this reason, any determination regarding that issue would constitute an advisory opinion, which courts are prohibited from issuing. *Brooks v. Northglen Ass'n*, 141 S.W.3d 158, 164 (Tex. 2004) (explaining that separation of powers provision bars issuance of advisory opinions).

11

section 752.004 that specifically lists "a highway" as a location that temporary work may not be performed on unless appropriate safety measures are taken. Tex. Health & Safety Code Ann. § 752.004.

Moreover, SPA Pipe's construction of the notification requirement essentially inverts the intention of that portion of section 752.003. SPA Pipe argues that because of the need to notify a utility 48 hours before beginning work, temporary work can only refer to some type of activity that is planned at least 48 hours before the work will be initiated and does not apply to work that is unexpected or spontaneous in nature. In other words, an employer could order its employees to perform work within six feet of a power line without violating chapter 752 despite failing to notify the utility of the work provided that the need for the work came about accidentally or was unexpected.

We do not read section 752.003 in this manner. Rather than limiting the type of work that was covered by chapter 752, the legislature included the notification provision in order to require individuals about to engage in work near an overhead line to consult with the utility before carrying out the potentially life-threatening activity. In that sense, the fact that an individual did not have plans to perform temporary work near a power line or unexpectedly became aware of the possibility that work will have to be performed near an overhead line will not excuse the individual from the obligation of informing the relevant utility before any work can be initiated.[9] A contrary construction

---

[9] We also note that although the health and safety code requires a person to inform a utility "at least 48 hours before" he intends to engage in temporary work near a power line, *see* Tex. Health & Safety Code Ann. § 752.003, we can find nothing in the statute that prevents a utility from taking adequate safety measures before the end of the 48-hour notice period. In other words, the utility is not prevented from taking adequate safety precautions until 48 hours after receiving notice and may, instead, undertake appropriate safety measures, including de-energizing power lines, at any time.

12

would be inconsistent with the important public policy interests of imposing liability on the person causing work to be performed near a power line and of minimizing the potentially devastating consequences of performing work near power lines.

Moreover, SPA Pipe's construction would, in certain circumstances, also seem to excuse the notification requirement for the types of work that SPA Pipe insists chapter 752 was designed to cover. For example, if an employer was unaware of the existence of an overhead line when it ordered an employee to engage in construction work but discovered the existence of the power line during the work, the employer could order the employee to resume the work without any safety measures being taken and not violate chapter 752. Because chapter 752 would not apply in these circumstances, the indemnity provision found in section 752.008 would also not apply, which would effectively prohibit utilities, even non-negligent utilities, from being indemnified for damages they sustain as a result of someone engaging in temporary work near their power lines. We cannot construe chapter 752 in a manner that would so directly undermine the legislature's intent as expressed in the clear language of chapter 752.

For all these reasons, we believe that chapter 752 applies to the circumstances of this case. *Id.* §§ 752.003-.004.[10]

_____

[10] SPA Pipe also asserts that determining whether an individual is performing temporary work involves consideration of whether the individual has control over the premises that the work will be performed on and further asserts that chapter 752 should not apply in this case because there was no work site and, accordingly, because its employees could not have had sufficient control over a work site. As support for that assertion, SPA Pipe relies on *Hullum v. Skyhook Corp.*, 753 F.2d 1334 (5th Cir. 1985). In that case, the court had to determine whether Exxon could be held liable for a violation of the predecessor to chapter 752 when it hired an independent contractor to install a sign on the premises of a gas station that sold Exxon's products but was not owned by Exxon. The court determined that the phrase "person . . . responsible for work to be done" found in the statute meant that the person must possess some degree of control over the work site before application of

*The Failure to Comply with Height Requirements Does Not Render Section 752.008 Inapplicable*

On appeal, AEP also contends that the district court erred in granting SPA Pipe's motion for summary judgment because a utility's failure to maintain its lines above the statutory

---

the statute was proper. *Id.* at 1337-38. In reaching its conclusion, the court reasoned that "[f]ocusing liability on those parties who exercise some degree of control over the work site furthers the Texas legislature's policy of worker safety since those parties determine where the work is to be done; those parties are the ones most likely to know whether or not the work will be performed near a power line." *Id.* at 1337.

Although the *Hullum* court relied on the concept of a "work site" when making its determination, that concept is not found in the predecessor statute or in chapter 752. This absence was discussed in another independent contractor case that was decided after *Hullum*. *See Trail v. Friedrich*, 77 S.W.3d 508, 512 (Tex. App.—Houston [1st Dist.] 2002, pet. denied). In *Trail*, the court noted that both sets of statutes focus on the "person" responsible for temporary work and explained that although "the person responsible for the work may also exercise some control over the work site, another person, such as the owner of the premises, may have some control over the work site and yet have nothing whatever to do with the work except to authorize it and pay the contractor." *Id.* In light of this, the court concluded that *Hullum* was limited to its facts and concluded that the independent contractor was the person responsible for the work. *Id.* at 512-13.

For these reasons, SPA Pipe's reliance on the concept of a "work site" in relation to chapter 752 is problematic. However, even assuming that courts should consider whether a person had some degree of control over a "work site" as part of its determination of whether it is a person responsible for temporary work, resolution of that issue would be factually intensive. In light of the fact that the temporary work to be performed in this case was the removal of the power line from the tank located on SPA Pipe's truck and that SPA Pipe's employees had knowledge of the location and the type of work to be performed, had assumed responsibility for when and how the work was to be performed, and had control over the operation of their truck, we would conclude that there was a fact issue regarding whether the requisite control over a work site was satisfied here. *Cf. Chavez v. City of San Antonio*, 21 S.W.3d 435, 439 (Tex. App.—San Antonio 2000, pet. denied) (explaining that imposing liability on person who exercises "'some degree of control' over the work site" is proper because that party has "knowledge of where the work is to be done and, therefore, will most likely know whether or not the work will be performed near a power line" and further explaining that appropriate factors to consider in work site determination are who had knowledge of type and location of work to be done, who had assumed responsibility for when and in what manner work would be performed, and who was present when work was performed); *see also Cathey v. Booth*, 900 S.W.2d 339, 341 (Tex. 1995) (noting that to be entitled to summary judgment, movant must show that there is no genuine issue of material fact). Accordingly, we would conclude that summary judgment could not have been granted in SPA Pipe's favor on this issue.

minimum does not render the indemnity provision inapplicable or excuse compliance with the requirements of chapter 752, e.g. the duty to inform a utility prior to beginning work within six feet of a power line. SPA Pipe, on the other hand, argues that because the indemnity provision of the health and safety code and the height restriction of the utilities code both pertain to overhead power lines, both provisions should be read together and should be read to mean that the indemnity provision does not apply when a utility fails to satisfy the height obligation found in the utilities code. *Cf. Sani v. Powell*, 153 S.W.3d 736, 744 (Tex. App.—Dallas 2005, pet. denied) (explaining that statutes that are "in pari materia are to be read and construed together in arriving at the intention of the legislature"). In other words, SPA Pipe surmises that the indemnity provision only allows indemnity for "an innocent utility company whose lines were maintained at the proper statutory height." Moreover, SPA Pipe asserts that construing the relevant provisions in this manner is the best way to maximize public safety; otherwise, SPA Pipe urges that there would be no incentive for a utility to maintain their lines at the required height. *Cf. Ringo*, 569 S.W.2d at 35 (noting that predecessor to chapter 752 was enacted to help ensure "the safety of persons engaged in activities near high voltage lines").

For the reasons that follow, we disagree with SPA Pipe. First, the language of section 752.008 does not contain qualifications limiting its applicability to situations in which the utility is without fault. In fact, the terms of section 752.008 indicate that the provision applies to situations in which the utility has been at fault to some degree. *See* Tex. Util. Code Ann. § 752.008. Section 752.008 states, in part, that a utility is entitled to indemnity "for all liability that the [utility] incurs as a result of" contact with one of its power lines. *Id.* (emphasis added). Because the

15

provision allows for indemnity "for all liability" incurred by the utility, the provision seems to apply to circumstances in which the utility's own actions contributed to the damage caused by contact with one of its lines. Moreover, we note that if the legislature had intended the provision to only apply to cases in which the utility was without fault, it could have easily stated so.

Second, SPA Pipe's construction is inconsistent with case law addressing the issue of whether the indemnity provision applies when the utility was negligent. For example, in *Moore v. Southwestern Elec. Power Co.*, the court explained that by passing the predecessor to chapter 752, the legislature intended for a person who violated one of the predecessor's provisions to indemnify the utility for any liability it sustains as a result of the violation even if the utility was also negligent. 737 F.2d 496, 500 (5th Cir. 1984), *cert. denied*, 469 U.S. 1211 (1985); *see also Trail*, 77 S.W.3d at 513-14 (concluding that because person responsible for work near power line violated chapter 752 by failing to notify utility of his intent to perform work near power line, he cannot maintain negligence claim against utility by alleging, among other things, that utility failed to maintain its lines at proper height); *Olson v. Central Power & Light Co.*, 803 S.W.2d 808, 812 (Tex. App.—Corpus Christi 1991, writ denied) (refusing to apply rule of contract interpretation prohibiting party from receiving indemnity for its own negligence in statutory indemnity context). Similar support can be found in *Martinez v. Gulf States Util. Co.*, 864 S.W.2d 802, 804 (Tex. App.—Houston [14th Dist.] 1993, writ denied). In that case, the court concluded that the health and safety code provision requiring that a utility be indemnified applied regardless of whether the utility had the legal authority to install a power line on the property in question. *Id.* at 804. In

16

other words, the court reasoned that even if the utility was a trespasser, it was still entitled to indemnity.[11]

Third, construing the relevant statutory provisions in the manner proposed by SPA Pipe would be inconsistent with the significant public policy concerns that the legislature was trying to address with the passage of chapter 752. Essentially, SPA Pipe's construction would place no obligation on an employer to contact a utility and ask that a utility de-energize a line prior to ordering one of its employees to engage in potentially life-threatening activities on or near a power line that has, for whatever reason, fallen below the minimum height required by the utilities code. This is contrary to the emphasis the legislature placed on requiring an employer to notify a utility prior to instructing an employee to begin work that will place the employee within six feet of an overhead line so that appropriate safety measures can be made to minimize the danger to the employee of working near overhead lines. *See* Tex. Health & Safety Code Ann. §§ 752.003-.004; *see also Kimery v. Public Serv. Co.*, 622 P.2d 1066, 1071 (Ok. 1980) (noting that public policy of

---

[11] This construction is also supported by case law from Arizona, which has a similar indemnification statute. For example, in *Tucson Elec. Power Co. v. Dooley-Jones & Assocs.*, the court explained that by passing the indemnity statute, the Arizona legislature intended for utilities to be indemnified even if the utilities' negligence contributed to the damage sustained. 746 P.2d 510, 512-13 (Ariz. Ct. App. 1987); *see also* Ariz. Rev. Stat. § 40-360.44 (1999) (stating that person who violates statute and causes "contact with any high voltage overhead line . . . is liable to the public utility operating the high voltage overhead line for all damages to the facilities and all costs and expenses, including damages to third persons, incurred by the public utility as a result of the contact"). Similar support can also be found in case law from Georgia. Rather than provide for indemnity, the relevant statute in Georgia excuses a utility from liability altogether. In particular, the statute provides that a utility "shall not be liable for damage or loss to person or property resulting from work within ten feet of high voltage lines unless notice has been given." Ga. Code Ann. § 46-3-39. When interpreting this provision, the court in *Williams v. Mitchell County Elec. Membership Corp.* explained that the statute confers immunity even if the utility fails to maintain its lines at the required height. 566 S.E.2d 356, 360-61 (Ga. Ct. App. 2002), *aff'd* 582 S.E.2d 107 (Ga. 2003).

reducing injuries caused by electric shock is "more effectively served" by placing burden of care on "persons who engage in activities near power lines" rather than requiring "utilities to maintain constant surveillance over the thousands of miles of power lines which it maintains").

Finally, we disagree with the reasoning of the case primarily relied upon by SPA Pipe as support for its argument that AEP's failure to maintain its lines above the statutory minimum bars indemnification under section 752.008. *See Grayson Collin Electric Co-Operative v. Mercer*, No. 19,246, 1977 Tex. App. LEXIS 3412 (Tex. Civ. App.—Dallas Sept. 23, 1977) (not designated for publication); *see also* Tex. R. App. P. 47.7(b) (explaining that unpublished opinions have no precedential value). In *Mercer*, a pole holding up electrical lines had fallen after a thunderstorm, which caused the electrical wires to sag. 1977 Tex. App. LEXIS 3412 at *1. In an attempt to prevent the wires from entangling his livestock, the property owner, Mercer, attempted to remove the electrical wires from the fallen pole. *Id.* Prior to purchasing the property, Mercer had been informed that the wires were inactive, and Mercer had not requested that the wires be energized. *Id.* at *2. However, the wires were in fact energized, and shortly after attempting to remove the wires, Mercer sustained significant injuries and eventually died as a result of those injuries. *Id.* After Mercer died, his widow, Edna Mercer, sued Grayson-Collin Electric Co-Operative ("Grayson"). Grayson argued that Edna was not entitled to recover because Mercer had violated the statutory prohibition against performing "any function or activity" "within six feet of any high voltage overhead line." *Id.* at *5-6, 9. The appellate court disagreed. The court determined that the prohibition against performing work within six feet of any "overhead line" does not apply to lines that are below the 22 foot minimum because those lines no longer qualified as "overhead" lines. *Id.*

18

at *7-9. In light of this, the court concluded that a person could not be considered contributorily negligent per se for coming into contact with those types of lines. *Id.* at *8-9; *see also Reeder v. Daniel*, 61 S.W.3d 359, 361 62 (Tex. 2001) (explaining that negligence per se is "a common law doctrine that allows courts to rely on a penal statute to define a reasonably prudent person's standard of care"). Essentially, the court reasoned that a person cannot violate the statutory prohibition if he comes in contact with a power line that has fallen below the 22 foot minimum. *Mercer*, 1977 Tex. App. LEXIS 3412 at *5.

Although the utilities code does direct utilities to maintain their power lines above a certain height, we can find no indication from either the utilities code or the health and safety code that lines sagging below this minimum no longer qualify as overhead lines. In fact, the definition of overhead line found in the health and safety code contains no minimum or maximum height and simply defines that type of line as "a bare or insulated electrical conductor installed above ground." *See* Tex. Health & Safety Code Ann. § 752.001(2). Nothing in that definition would seem to render the safety and indemnification provisions inapplicable to the lines at issue in this case.[12] More importantly, adopting the reasoning articulated in the *Mercer* opinion would directly contravene the

---

[12] We also note that the circumstances that the *Mercer* court was confronted with are different than the ones presented in this case. *See Grayson-Collin Electric Co-Operative v. Mercer*, No. 19,246, 1977 Tex. App. LEXIS 3412 (Tex. Civ. App.—Dallas Sept. 23, 1977) (not designated for publication). The *Mercer* case did not directly address the indemnity provision at issue in this case because the utility in *Mercer* was not seeking indemnification for liability it sustained as a result of a violation of the health and safety code. *See* Tex. Health & Safety Code Ann. § 752.008. Moreover, in reaching its resolution in that case, the *Mercer* court noted that Mercer owned the land on which the pole had fallen and emphasized the potential inequity of denying any recovery to a landowner attempting to "protect his property from the danger of a fallen line, even though the landowner might be careful to avoid any contact with the wires." *Mercer*, 1977 Tex. App. Lexis 3412 at *9. Those concerns are not present in this case.

clear legislative directive requiring employers to contact utilities and enter into safety agreements before requiring their employees to engage in work on or near active power lines and would encourage rather than discourage the initiation of hazardous work near power lines. We cannot construe chapter 752 and the height requirement in a manner that would endanger the health and safety of employees across Texas.

For all these reasons, we conclude that AEP's failure to comply with the minimum height requirement found in the utilities code does not render section 752.008 inapplicable.

**CONCLUSION**

Having concluded that neither of the two grounds listed in SPA Pipe's motion for summary judgment support the district court's judgment, we reverse the district court's judgment and remand for further proceedings consistent with this opinion.

_____

David Puryear, Justice

Before Justices Puryear, Pemberton and Waldrop

Reversed and Remanded

Filed: December 12, 2008